UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMOLITION CONTRACTORS, INC.,
d/b/a Pitsch Wrecking Co.,

        Plaintiff,                     Case No. 1:07-cv-112

v.                                        HON. JANET T. NEFF

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY,

        Defendant.
_____/

**OPINION**

      Plaintiff Demolition Contractors, Inc., filed this breach of contract action seeking coverage for an insurance claim under a commercial general liability policy issued by defendant Westchester Surplus Lines Insurance Company. Pending before the Court is defendant's Motion for Summary Judgment (Dkt 20). Plaintiff filed a response in opposition to the motion, and defendant filed a reply. The Court thereafter granted plaintiff's motion for leave to file a surreply and permitted a further response by defendant. Pursuant to W.D. Mich. LCivR 7.2(d), the motion for summary judgment is decided without oral argument. For the reasons that follow, the motion is denied.

      This case involves a dispute over insurance coverage after plaintiff sought reimbursement for the costs of replacing paved roads in the Autumn Ridge Subdivision in Greenville, Michigan. According to the complaint, plaintiff sold concrete gravel to Smith Brothers, which used the gravel to pave the roads for an expansion in the subdivision (Compl. ¶¶ 11-12). The concrete gravel supplied by plaintiff caused the roads to "pimple up" after they were paved (*id.* ¶ 13). After an

investigation, plaintiff paid $234,727.06 to have the roads replaced and for incidentals associated with the repaving (*id.* ¶ 21).

Plaintiff filed a claim for coverage of the costs of replacing the roads (*id.* ¶ 15). Defendant denied coverage (*id.* ¶ 16). Plaintiff claims that the damage to the roads is property damage that should be covered under its general liability policy with defendant (*id.* ¶ 17).

Defendant has moved for summary judgment. A motion for summary judgment is properly granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Harbin-Bey v. Rutter,* 420 F.3d 571, 575 (6th Cir. 2005).

The party moving for summary judgment has the initial burden of showing that no issue of genuine material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial. *Id.* Plaintiff has met this burden. In this case, the parties directly contest the material facts and their bearing on plaintiff's claim. Accordingly, defendant is not entitled to summary judgment.

Defendant argues that the clear and unambiguous policy language precludes coverage of plaintiff's claim. Defendant asserts that plaintiff voluntarily repaired the roadways without defendant's consent and without an agreed settlement or a final judgment requiring it to do so in violation of the policy terms. Defendant argues that because plaintiff violated the policy terms,

plaintiff is precluded from taking legal action against defendant under the express language of the policy.

Defendant cites two provisions of the commercial general liability policy issued to plaintiff as entitling defendant to judgment as a matter of law. First, defendant relies on a "voluntary payment" provision, which contains certain conditions and duties that an insured must follow in the event of an occurrence or claim. Those duties include a duty to make no voluntary payments without the consent of defendant, as follows:

> **Sec. IV. Commercial General Liability Conditions**
> \*\*\*
> **2. Duties In the Event of Occurrence, Offense, Claim or Suit**
> \*\*\*
> d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

Defendant contends that plaintiff voluntarily repaired the roadways without defendant's consent, contrary to the above provision.

Second, defendant argues that this action is barred by a provision in the policy pertaining to legal action. The pertinent part of the policy reads as follows:

> **3. Legal Action Against Us**
>
> No person or organization has a right under this Coverage Part:
> \*\*\*
> b. To sue us on this Coverage Part unless all of its terms have been fully complied with.
>
> A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable

limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Defendant contends that the above "legal action" provision in the insurance policy precludes any lawsuit against defendant if the insured has not complied with the terms of the policy. If the insured has complied with the terms of the insurance policy, then defendant may be sued in order to recover on an agreed settlement or on a final judgment against an insured. Defendant asserts that it is undisputed that there was no final judgment against plaintiff arising out of the deteriorating roads. Defendant also asserts that, furthermore, defendant was not a party to any settlement with plaintiff and any claimant. Defendant argues that because the requirements under the legal action provision are conditions precedent to a lawsuit that plaintiff has failed to meet, plaintiff's action is barred.

Moreover, defendant contends that there was no waiver of the "no action" provision. Citing *Elliot v. Cas. Ass'n of America,* 236 N.W. 782 (Mich. 1931), defendant asserts that in order to show waiver, an insured must demonstrate that the insurance company denied liability and refused to defend an action brought against the insured. Defendant asserts that because no lawsuit has ever been filed against plaintiff as a result of the damaged roadways, defendant has never refused to defend an action against plaintiff. Accordingly, defendant did not waive the "no action" clause.[1]

Defendant also argues that it is entitled to summary judgment because plaintiff paid to repair the deteriorating roadways without being "legally obligated" to do so. Defendant asserts that the policy's commercial general liability coverage form provides that defendant will pay for those sums

---

[1] It is noteworthy, however, that the Michigan Supreme Court recently reaffirmed that the traditional contract doctrines of waiver and estoppel may apply generally in the context of insurance policies. *McDonald v. Farm Bureau Ins. Co.,* 747 N.W.2d 811, 814, 819-820 (Mich. 2008).

4

that the insured becomes "legally obligated" to pay as damages because of bodily injury or property damage to which this insurance applies.

In response to defendant's arguments, plaintiff argues that defendant unreasonably withheld its consent and unreasonably denied plaintiff's claim, even after plaintiff's counsel confirmed defendant's agreement to replace the asphalt. Plaintiff asserts that defendant admitted and agreed that the policy provided coverage for asphalt replacement, but arbitrarily decided that the costs to remove the contaminated subbase were not covered.

Further, plaintiff argues that it is entitled to defenses of mitigation of damages and public policy. Plaintiff contends that public policy dictated that plaintiff had to replace the roadways immediately to prevent potential environmental contamination. Plaintiff cites a February 24, 2006 report from an engineering firm, Westshore Consulting, hired by defendant to investigate and analyze the road surface problem. Plaintiff asserts that based on the test data, Westshore's report indicated that if plaintiff did not replace the roads immediately, defendant faced even greater liability because of the environmental impact to the groundwater, drinking water, aquifer, and nearby wetlands. The report concluded that the cause of the road failure was the presence of ettingite in the crushed concrete provided by plaintiff. Plaintiff asserts that Westshore recommended that the road and road bed be removed and replaced.

Plaintiff contends that based on Westshore's report, defendant clearly faced exponentially more liability had plaintiff not promptly remediated the problem. Plaintiff argues that it defies logic to deny coverage because plaintiff took steps to limit damages, particularly after defendant admitted liability for coverage of damages to the pavement. Plaintiff argues that because of the potential

5

environmental contamination, plaintiff is entitled to a public policy exclusion to the voluntary payment provision.

The parties have provided no persuasive authority to resolve the disputed issues as a matter of law. On the limited authority before the Court, it is clear that there are genuine issues of material fact bearing on the parties' dispute over coverage.

For example, defendant contends that plaintiff repaired the roadways without defendant's knowledge or consent. Defendant also asserts that it was not a party to any negotiations that led to plaintiff performing remedial work in regard to the roads. However, it is undisputed that plaintiff notified defendant of the roadway claim in January 2006, as evidenced by defendant's acknowledgment of the claim on January 11, 2006. It is also undisputed that defendant then hired Westshore Consulting to analyze the road deficiencies. Further, plaintiff presented evidence that defendant acknowledged at least partial coverage of the claim. In a March 3, 2006 letter to plaintiff, prior to plaintiff undertaking the roadway repair, defendant's representative Bruce Alles stated that the "policy provides coverage for the resulting damage to the bituminous pavement" (Pl's. Resp., Ex. 5, p. 7). Additionally, plaintiff has presented evidence that defendant acknowledged this coverage would amount to $100,000 of the overall claim (Pl's Surreply, Exs. 1-2). This evidence creates issues of material fact regarding defendant's knowledge and consent with regard to the road repair undertaken by plaintiff.

Likewise, the parties dispute whether plaintiff is entitled to a defense based on public policy and mitigation of damages. Defendant was clearly aware of the potential for environmental impact. Defendant hired Westshore Consulting to conduct an investigation. Westshore's February 24, 2006 report provided an Environmental Analysis and Recommendations, stating in part:

>Westshore reviewed the laboratory testing data that was provided, and Table 1 provides the results of the tests for total concentrations of metals, and Table 2 indicates the laboratory results after subjecting the metal samples to two different leaching tests. Samples #1 through #4 were analyzed using the Synthetic Precipitation Leaching Procedure (SPLP) and the Toxicity Characteristic Leaching Procedure (TCLP). Each of these tests provide information regarding the potential for a material to leach if an acidic solution (i.e., rainwater) may mix with the material.
>
>A total of 20 different metals and three anions were found to be present in concentrations that exceeded the laboratory detection methods. Table 1 shows the concentrations of the detected constituents and compares those results to the MDEQ Part 201 Generic Cleanup Criteria and Screening Levels (MDEQ, June 24, 2005). Of the 20 detected constituents, 7 of the metals are present in concentrations that exceed the Drinking Water Protections Criteria, five of the constituents exceed the Groundwater Surface Water Interface Protection Criteria and chloride exceeds the Direct Contact Criteria. As shown on Table 2, additional testing of the detected metal constituents resulted in aluminum, boron, cobalt, iron and manganese leaching out of the soil sample when undergoing the more stringent TCLP analysis. These five metals exceeded the Residential and Commercial I Drinking Water and Groundwater Surface Water Interface Criteria. When the same soil samples were tested using the SPLP methods, both aluminum and iron were found to leach, but only aluminum was present in concentrations that exceeded the Residential and Commercial I Drinking Water Criteria.
>
>The Chemical make up of the aggregate that is present as the subbase presents some potential environmental risk. Although there is no evidence that any of the metals or chloride have leached into the underlying native soils, the test data provides a likely indication that leaching could occur in the future. In addition, the test results suggest that leaching may occur at concentrations that could be harmful to the aquifer or nearby wetlands. . . . Even though there is no evidence of environmental contamination in the subsurface native soils or groundwater, the potential of future impact exists, and for this reason, Westshore recommends that the material be removed from the site and replaced with aggregate that does not have these characteristics.

Plaintiff presents the above report and two affidavits as support for its claim of an imminent environmental hazard necessitating plaintiff's remedial action of removing the contaminated pavement and repaving the road. According to the affidavit of Richard Marvin (Pl's. Br, Ex. 2 ¶¶ 3-4), an attorney representing the owner of the Autumn Ridge Phase II subdivision,

> (1) "Ettingite within the gravel, sub-base material provided by [plaintiff] caused the overlying asphalt membrane of the roadways to buckle and fail."
>
> (2) "The roadways in the subdivision were to be public roads and because of the said defects, the Montcalm County Road Commission would not approve or permit the roadways as constructed for use as a public road and/or would require them to be rebuilt."

Likewise, the affidavit plaintiff's former counsel, Andrew C. Vredenburg, (Pl's. Br, Ex. 3 ¶¶ 6-9) stated:

> (1) "In late 2005 or early 2006, attorneys for the road contractor and developer notified [plaintiff] of its liability for the gravel, of the Montcalm County Road Commission's inability to approve and permit the road as-is, and of the potential damages of lost lot/home sales in the development as a result."
>
> (2) "[Plaintiff] notified [defendant] of the claim, and received confirmation of the claim information on January 11, 2006."
>
> (3) "Soil samples obtained by [defendant's] own environmental consultant revealed that the gravel was contaminated with metals and posed an environment threat of leaching into the groundwater. The environmental consultant recommended removal of the gravel."
>
> (4) "Based on the threat of the loss of lot/home sales, potential environmental impacts, and the need to have the road approved by the Montcalm County Road Commission, *time was of the essence* to remove and replace the road and gravel to mitigate damages."

Defendant argues in reply that no "imminent environmental hazard existed" and that contrary to plaintiff's claim, review of the Westshore Consulting report does not support plaintiff's position. Defendant asserts that Westshore's studies and analysis proves just the opposite, that no evidence

of environmental contamination existed at all.  The parties thus directly dispute the issue of the potential for environmental contamination and mitigation of damages.  Given the disputed issues of material fact, the Court concludes that defendant is not entitled to judgment as a matter of law.

For the foregoing reasons, this Court DENIES defendant's motion for summary judgment of plaintiff's complaint.  An Order will be entered consistent with this Opinion.


Dated:  August 15, 2008                           /s/Janet T. Neff
                                                  JANET T. NEFF
                                                  UNITED STATES DISTRICT JUDGE