UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMOLITION CONTRACTORS, INC.,
d/b/a Pitsch Wrecking Co.

              Plaintiff,                    Case No. 1:07-cv-112

v.                                     HON. JANET T. NEFF

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY,

              Defendant.
_____/

**OPINION**

      Plaintiff Demolition Contractors, Inc., filed this breach of contract action seeking coverage for an insurance claim under a commercial general liability policy issued by defendant Westchester Surplus Lines Insurance Company.  The Court denied defendant's motion for summary judgment.  The case was submitted to the Court for decision in a bench trial consisting solely of stipulated exhibits and oral argument.  Based on the findings of fact and conclusions of law stated herein pursuant to Fed. R. Civ. P. 52(a), the Court determines that plaintiff is entitled to coverage of $100,000 minus a $25,000 deductible for the claim at issue.  The Court will enter Judgment in favor of plaintiff in the amount of $75,000.

I.  Introduction

      This case involves a dispute over insurance coverage after plaintiff sought reimbursement for the costs of replacing paved roads in the Autumn Ridge Subdivision in Greenville, Michigan.  Plaintiff supplied crushed concrete gravel that was used as a subbase for asphalt roads in an

expansion of the subdivision.  The concrete gravel supplied by plaintiff caused the roadways to

"pimple up" after they were paved, necessitating remediation.  Plaintiff paid $234,727.06 to have

the roads removed and repaved.  Plaintiff filed an insurance claim with defendant for coverage of

the costs of replacing the roads.  Defendant denied coverage.

The issue presented is whether plaintiff is entitled to insurance coverage, under its general

liability policy with defendant, for the costs of replacing the damaged asphalt in the subdivision,

where defendant concedes that there is coverage under the policy for at least part of plaintiff's claim

but contends that because plaintiff failed to comply with the policy's provisions precedent to the

payment of claims, any coverage is negated.  This Court has diversity jurisdiction over this case

pursuant to 28 U.S.C. § 1332(a).

## II.  Underlying Facts

There is no material dispute concerning the underlying facts, which the Court finds as

follows.  Plaintiff secured a commercial general liability insurance policy from defendant, with a

policy period of May 1, 2005 to May 1, 2006.  With regard to coverage, the policy's "Insuring

Agreement" stated: "We will pay those sums that the insured becomes legally obligated to pay as

damages because of 'bodily injury' or 'property damage' to which this insurance applies."

The general liability policy contained a "voluntary payments" provision, setting forth certain

conditions and duties that an insured must follow in the event of an occurrence or claim.  Those

duties include a duty to make no voluntary payments without the consent of defendant, as follows:

SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

***

**2.   Duties In the Event of Occurrence, Offense, Claim or Suit**

***

> d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

The policy also contained a "no action" clause pertaining to legal action, stating in pertinent part:

**3.   Legal Action Against Us**

> No person or organization has a right under this Coverage Part:

***

> b.  To sue us on this Coverage Part unless all of its terms have been fully complied with.

> A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance.  An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

In the summer of 2005, plaintiff supplied crushed concrete to Smith Bros. Contracting, Inc., which Smith Bros. used as a gravel subbase to pave asphalt roads in the Autumn Ridge Subdivision in Greenville, Michigan.  By the fall of 2005, the asphalt roadways began to pit, pimple, and crack. An investigation by Soil & Structures, Inc. (S & S) determined that the road problems were caused by the formation of the mineral ettringite in the crushed concrete supplied by plaintiff.  S & S recommended three options to repair the road, one of which was complete removal and replacement. In December 2005, when plaintiff was notified that the crushed concrete supplied by plaintiff was the source of the road problem, plaintiff filed an insurance claim under its policy with defendant.

3

On January 11, 2006, defendant's representative, Bruce Alles, acknowledged receipt of plaintiff's claim and advised plaintiff that he would be handling the claim.

In response to plaintiff's insurance claim, defendant retained Westshore Consulting to perform an engineering analysis and make recommendations concerning the most suitable method to handle the deficiencies with the road surface. On February 24, 2006, Westshore sent a report to Alles, including an "Environmental Analysis and Recommendations," which determined that the subbase in Autumn Ridge roadways posed a *potential* environmental risk, stating:

> The Chemical make up of the aggregate that is present as the subbase presents some potential environmental risk. Although there is no evidence that any of the metals or chloride have leached into the underlying native soils, the test data provides a likely indication that leaching could occur in the future. In addition, the test results suggest that leaching may occur at concentrations that could be harmful to the aquifer or nearby wetlands. . . . Even though there is no evidence of environmental contamination in the subsurface native soils or groundwater, the potential of future impact exists, and for this reason, Westshore recommends that the material be removed from the site and replaced with aggregate that does not have these characteristics.

In a "reservation of rights" letter to plaintiff dated March 3, 2006, Alles acknowledged the receipt of a potential claim from plaintiff and the results of its investigation of the roadways, including (1) that the concrete gravel supplied by plaintiff caused the roadways to pimple due to the formation of the mineral ettringite, and (2) that there may be some environmental risk in that the chemical make-up of the aggregate could leach into the ground in the future and ultimately affect the groundwater. However, Alles' letter notified plaintiff that the remediation of the roadway was not fully covered under plaintiff's commercial general liability policy. The letter detailed the policy's coverage provisions as they pertained to plaintiff's claim, and stated that defendant was in receipt of a Road Reconstruction bid by Smith Bros. The letter analyzed the work to be performed

vis-à-vis the policy provisions, and determined that the remediation work generally would not

covered, but that the policy provided coverage for damage to the bituminous pavement:

> WSLIC [defendant] understands that the "property damage" sustained by the
> bituminous pavement was directly related to the formation of the mineral ettringite
> in the aggregate base DCI [plaintiff] supplied for this project.  The WSIC policy
> provides coverage for the resulting damage to the bituminous pavement.

Alles' letter concluded by stating, "WSLIC does not waive its right to assert additional coverage

defenses should other coverage issues become apparent."

Over the course of the next several months, communications continued between plaintiff and

defendant concerning remediation of the road and coverage of plaintiff's claim.  On April 20, 2006,

plaintiff's in-house counsel, Andrew Vredenburg, wrote Alles in response to the "reservation of

rights" letter.  Vredenburg's letter stated that he had reviewed Alles' letter and it appeared that Alles

agreed that coverage was provided in part for the proposed remediation work at Autumn Ridge:

> As I understand it, you have agreed that Westchester Speciality Group will
> pay for the replacement of asphalt that was damaged as a result of the mineral
> ettringite being formed in the aggregate DCI supplied to the owner and/or its
> contractor who constructed the roads in Autumn Ridge.

Vredenburg's letter briefly reviewed the circumstances of the problem with the Autumn Ridge

roadways, writing that according to the engineers, including Westshore Consulting, ettringite is a

natural forming mineral that unbeknowst to DCI can occur in concrete, which resulted in the asphalt

"pimpling."  Vredenburg stated that the parties therefore had proposed "removing the asphalt

roadways and the aggregate to prevent any future potential problem with the development of

ettringite causing additional damage to any newly constructed roads in Autumn Ridge."  Vredenburg

therefore requested that Alles reconsider his denial of coverage since plaintiff believed that coverage

5

should be provided not only for the replacement of the asphalt and aggregate, but also for the remaining costs of remediation.

In late April 2006, plaintiff began remediation on the roads in Autumn Ridge, utilizing in part its own resources, rather than contracting the work under the earlier bid from Smith Bros. Plaintiff incurred costs of more than $234,000 in road repairs and professional fees. Of that amount, plaintiff claims $167,000 for expenses related directly to the removal and replacement of the road.

Defendant denied insurance coverage for any of the costs incurred by plaintiff in remediation of the Autumn Ridge roadways on the grounds that plaintiff violated the "voluntary payments" provision and the "no action" clause of the insurance policy, which relieved defendant of any obligation for coverage under the unambiguous terms of the policy.

### III.  Analysis

Plaintiff argues that the damage to the roads is property damage that should be covered under its general liability policy.  Plaintiff relies on several independent bases for its entitlement to coverage:  (1) plaintiff was "legally obligated" to repair the road and defendant formally acquiesced to cover some of the road repair; (2) defendant waived the "voluntary payments" provision; (3) equity requires that defendant be estopped from enforcing the "voluntary payments" provision; (4) defendant had to repair the road to avoid an imminent environmental threat; and (5) plaintiff had a duty to mitigate defendant's possible damages.

Defendant argues that plaintiff is not entitled to any coverage of the claim because plaintiff failed to comply with the terms of the insurance policy: (1) plaintiff had no legal obligation to repair the roadways; (2) since there was no imminent environmental hazard, plaintiff's violation of the

6

"voluntary payments" and "no action" clauses of the policy is not excused; (3) defendant did not

waive the application of its "voluntary payments" and "no action" clauses since there is no evidence

of a voluntary relinquishment of defendant's right to enforce those policy provisions; (4) there is no

basis for the application of promissory estoppel; and (5) defendant's offer of settlement of $75,000

was contingent on a policy release for this claim, and since plaintiff never accepted the offer, the

settlement offer is not a basis for plaintiff's assertion of waiver or estoppel.

The parties agree that this case is governed by Michigan law.  Under Michigan law, an

insurance policy must be enforced according to its plain and unambiguous terms.  *McDonald v.

Farm Bureau Ins. Co.,* 747 N.W.2d 811, 816 (Mich. 2008); *Heath v. State Farm Mut. Auto. Ins. Co.,*

659 N.W.2d 698, 699 (Mich. Ct. App. 2002).  "In an action on [an insurance] policy, once the

insurer has proved an affirmative defense, the burden then shifts to the plaintiff to establish a waiver

or estoppel … ."  14 MICH. CIV. JUR., *Insurance* § 352, p. 404 (2008) (footnote omitted).  Although

there is a technical distinction between implied waiver and estoppel, in insurance cases these terms

are used interchangeably, and thus reference is sometimes made to "waiver by estoppel."  *Id.,* § 349,

pp. 400-401.  "In insurance cases, any waiver, other than an express waiver, is based on the doctrine

of estoppel."  *Id.,* § 353, pp. 404-05.

In the context of an insurance claim, estoppel "refers to an abatement, raised by law, of the

insurer's rights and privileges where it would be inequitable to permit the assertion of these rights."

*Id.,* § 353, p. 405.  Under Michigan law, equitable estoppel applies when a plaintiff establishes (1)

acts or representations by the defendant that induced the plaintiff to believe that coverage existed,

(2) the plaintiff justifiably relied on its belief, and (3) the plaintiff was prejudiced as a result of its

reliance on its belief.  *Id.* (citing *Sitto Enters., Inc. v. Badger Mut. Ins. Co.,* 414 F. Supp. 2d 700

7

(E.D. Mich. 2006)); *McDonald,* 747 N.W.2d at 819.  "To prove estoppel, it must appear that the insurer, with knowledge of the facts, by acts, representations, admissions, or by silence when it ought to speak out, intentionally, or with culpable negligence, induced the insured to detrimentally rely on the belief that the insured was entitled to rights under the policy."  MICH. CIV. JUR., *supra,* § 353, p. 406 (footnotes omitted).

In light of the above legal principles under Michigan law, it is the Court's determination that coverage exists under the commercial general liability policy at issue for at least part of the costs incurred by plaintiff in remediating the Autumn Ridge roadways.  However, plaintiff's failure to comply with the policy's unambiguous provisions for obtaining payment of a claim relieves defendant of its obligation for payment of the costs incurred by plaintiff.  Nonetheless, defendant is estopped from denying coverage that Alles expressly stated existed in his March 3, 2006 letter to plaintiff.  The Court renders the following findings of fact and conclusions of law.

## A.  *Findings of Facts*

1.    Following its investigation of plaintiff's claim for insurance coverage for the removal and replacement of roadways in the Autumn Ridge subdivision, defendant notified plaintiff in writing that the policy provided coverage for damage to the bituminous pavement.

2.    In a response letter, plaintiff's counsel stated that he had reviewed Alles' letter and it appeared that Alles agreed that coverage was provided in part for the proposed remediation work at Autumn Ridge:

> As I understand it, you have agreed that Westchester Speciality Group will pay for the replacement of asphalt that was damaged as a result of the mineral ettringite being formed in the aggregate DCI supplied to the owner and/or its contractor who constructed the roads in Autumn Ridge.

3.     Following defendant's representation of partial coverage for the claim, plaintiff undertook removal and replacement of the Autumn Ridge roadways, and thereafter sought reimbursement for costs incurred beginning on April 20, 2006.

4.     Defendant represented to plaintiff that defendant would pay $100,000 minus a $25,000 deductible in settlement of plaintiff's claim.

5.     Defendant's offer of payment was not made based on any express contingencies such as a "buy-back" of the policy, but instead represented payment for that portion of the projected costs covered under the insurance policy.

B.  *Conclusions of Law*

1.     Although partial coverage existed under the policy for plaintiff's claim, defendant has set forth a valid defense to coverage on the grounds that plaintiff failed to comply with the policy provisions, including the policy's "voluntary payment" and "no action" clauses.

2.     Nonetheless, defendant is estopped from denying coverage with respect to that portion of the claim that defendant admitted in writing was covered under the policy, and therefore, defendant is obligated to pay plaintiff $75,000, which represents payment for the costs that defendant determined were covered under the policy, minus plaintiff's deductible:

    a.     defendant's acts or representations induced plaintiff to believe that partial coverage existed for the Autumn Ridge subdivision claim,

    b.     plaintiff justifiably relied on its belief in undertaking remediation of the roadways, and

    c.     as a result of its belief, plaintiff was prejudiced by incurring costs for removal and replacement of the roadways.

3.      Plaintiff has failed to show that under Michigan law, the Autumn Ridge roadways posed an imminent environmental threat such that plaintiff believed that it had to repair the roads immediately, and thus, plaintiff was not excused from its violations of the policy's "voluntary payment" and "no action" clauses.

4.      Plaintiff has failed to show that under Michigan law plaintiff is excused from its violations of the policy's "voluntary payment" and "no action" clauses because plaintiff "faced a possibility of fines from both [f]ederal and [s]tate agencies" and "a plethora of civil litigation," given the possible environmental damage, and therefore plaintiff was not justified in proceeding with the road repairs based on a duty to mitigate defendant's possible damages.

Given the above findings of fact and conclusions of law, plaintiff is not entitled to coverage under the commercial general liability policy of claimed costs of $167,000 that plaintiff incurred in repairing the Autumn Ridge roads.  However, plaintiff is entitled to recover $75,000 for that portion of the road repair that defendant represented was covered under the policy prior to plaintiff proceeding with removal and replacement of the roadways.

## IV.  Conclusion

Consistent with this Opinion, a judgment will be entered in favor of plaintiff in the amount of $75,000.


Dated:  April 3, 2009                           /s/Janet T. Neff                                    
                                                JANET T. NEFF
                                                UNITED STATES DISTRICT JUDGE